January 13, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1363

UNITED STATES OF AMERICA,
Appellee,

v.

DANIEL F. AVERSA,
Defendant, Appellant.

No. 91-1364
UNITED STATES OF AMERICA,
Appellee,

v.

VINCENT MENTO,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Martin F. Loughlin, Senior U.S. District Judge]

No. 91-1574
UNITED STATES OF AMERICA,
Appellee,

v.

WILLIAM J. DONOVAN,
Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Shane Devine, U.S. District Judge]

Before

Breyer, Chief Judge,

Coffin and Bownes, Senior Circuit Judges,

Torruella, Selya, Cyr and Boudin, Circuit Judges.

Robert V. Johnson II, for appellant Aversa.

David A. Ross, with whom Eaton, Solms, McIninch & Phillips

was on brief, for appellant Mento.
Jonathan R. Saxe, with whom Twomey & Sisti Law Offices was

on brief, for appellant Donovan.
Peter E. Papps, First Assistant United States Attorney, with

whom Jeffrey R. Howard, United States Attorney, and Richard A.

Friedman, Attorney, Department of Justice, were on brief, for the

United States.

OPINIONS EN BANC

SELYA, Circuit Judge. The government charged each of
SELYA, Circuit Judge.

these appellants with criminal violations of the Bank Records and

Foreign Transactions Act (BRFTA), Pub. L. No. 91-508, 84 Stat.

1114 (1970) (codified as amended in various sections of 12

U.S.C., 15 U.S.C., and 31 U.S.C.). Appellant Donovan was charged

with, and convicted of, failure to file currency transaction

reports (CTRs). See 31 U.S.C. 5313 (1988). Appellants Aversa

and Mento were charged with, and convicted of, structuring bank

deposits to avoid triggering currency transaction reporting

requirements. See 31 U.S.C. 5324 (1988). In each case, the

underlying legal requirement comprises part of Subchapter II of

the BRFTA. Subchapter II's criminal penalty provision, 31 U.S.C.

5322(a), proscribes only "willful" violations of the

subchapter's provisions.

A panel of this court initially heard Donovan's appeal

and decided it adversely to him. We subsequently withdrew the

panel opinion and granted rehearing en banc, consolidating the

appeal with appeals involving Aversa and Mento, so that we might

settle the meaning of the term "willful" as used in Subchapter

II.1 The en banc court now affirms Donovan's conviction while

vacating the other convictions and remanding those cases for

further proceedings.

1The government filed cross-appeals challenging the
relatively mild sentences imposed on Mento and Aversa. In view
of our disposition of the issue before the en banc court, the
cross-appeals (Nos. 91-1615 and 91-1616) are moot. They will,
therefore, be dismissed without prejudice.

3

I. BACKGROUND

These cases originated in different ways and traveled

different paths to reach our doorstep. We sketch the background

and then frame the common issue that all three appeals present.

A. Donovan.

Donovan, the president and chief executive officer of

Atlantic Trust Company, a Boston-based financial institution,

moonlighted as a real estate developer. A friend, Dr. Edward

Saba, gave Donovan substantial sums of cash to deposit at

Atlantic Trust for eventual investment in a New Hampshire housing

subdivision. Eschewing Atlantic Trust's standard protocol for

routing deposits through tellers, Donovan personally deposited

Saba's money in five chunks of $30,000, $92,000, $30,000,

$55,000, and $30,000, respectively. Donovan made the deposits at

various times between March 13, 1987 and April 21, 1987.

Although Donovan was the bank's legal compliance officer a

status which presumptively suggests his familiarity with banking

laws he did not prepare CTRs for any of these deposits.

Indeed, Donovan fended off his subordinates' concerns about the

unorthodox way he was handling Saba's cash.

At trial, Donovan admitted that he was aware of the law

requiring him to file CTRs for cash deposits of $10,000 or more,

but insisted that he mistakenly believed Saba's deposits came

within one of the law's exemptions.2 The district court

2"Deposits or withdrawals of currency from an existing
account by an established depositor who . . . operates a retail
type of business" are exempted from the reporting requirements

4

instructed the jury that it was the government's burden to prove

Donovan "knowingly" and "willfully" failed to file CTRs. The

court twice explained these elements (once during the main charge

and once in answering an inquiry during jury deliberations):

An act or a failure to act is knowingly
done if it is done voluntarily and
intentionally and not because of mistake or
accident or other innocent reason. An act or
a failure to act is done willfully if done
voluntarily and intentionally and with the
specific intent to do something the law
forbids, that is to say with bad purpose,
either to disobey or disregard the law.

Despite Donovan's importuning, the district court refused to tell

the jury that any mistake by Donovan, regardless of its nature,

would necessitate acquittal. The jury found Donovan guilty.

B. Aversa and Mento.

Aversa and Mento were partners in a real estate

business. In January 1989, they sold a parcel of land, splitting

the proceeds. At the time, Aversa's marriage was foundering. In

order to conceal his share of the profits from his wife, Aversa

asked Mento to deposit the receipts in Mento's personal bank

account rather than in the partners' joint business account.

Mento agreed. Aversa signed a statement acknowledging his

responsibility for one-half of the funds to insulate Mento from

potentially adverse tax consequences.

Mento and Aversa knew that Mento's bank was legally

required to file CTRs for all deposits of $10,000 or more.

under 31 C.F.R. 103.22(b)(2)(i) (1987). Donovan does not
contend that Saba was an exempt customer under this, or any
other, section of the regulations.

5

Fearing that the resultant paper trail might obviate their

efforts to hide the cash from Mrs. Aversa, the defendants made

serial deposits and withdrawals in sums under $10,000. Although

both men admitted that they knew about the CTR requirement, they

claimed to be unaware that structuring bank transactions, even if

designed to avoid causing the bank to file CTRs, was itself a

crime.

Following the return of indictments, the government

moved in limine to prevent the introduction of evidence

supporting the defendants' mistake-of-law theory. Judge Loughlin

granted the motion. Aversa then pled guilty to structuring, but

did so conditionally, see Fed. R. Crim. P. 11(a)(2), reserving

his mistake-of-law defense for appeal. Mento opted for trial.

At the trial, the district court, over timely objection,

instructed the jury that mistake of law was not a defense to

structuring. The jury found Mento guilty.

C. The En Banc Issue.

Although these appellants breached different regulatory

provisions of Subchapter II, each was convicted under the

subchapter's criminal penalty provision, 31 U.S.C. 5322, and

each raised a mistake-of-law defense. We convened the en banc

court specifically to examine the efficacy of such defenses in

the CTR and antistructuring contexts. At bottom, this task

requires us to elucidate the state of mind that Congress required

when it limited such violations to willful misconduct.

II. DISCUSSION

6

We begin with an analysis of the governing statute,

exploring its interstices and explicating its meaning. We then

proceed to tackle the knotty mens rea questions that confront us.

A. The Statutory Scheme.

In 1970, concerned about the ease with which criminals,

particularly drug traffickers, were able to exchange ill-gotten

profits for "clean" money, Congress enacted the BRFTA. Among

other things, Subchapter II delegated to the Secretary of the

Treasury (the Secretary) the power to require banks and

individuals to file CTRs with the Internal Revenue Service when

cash changed hands.3 See, e.g., 31 U.S.C. 5313. The

Secretary did not exercise his delegated power in respect to

individuals, but required banks to file CTRs when transactions

involved $10,000 or more. See 31 C.F.R. 103.22(a)(1) (1989).

Although Subchapter II's transaction report requirement

expanded the armamentarium of federal law enforcement agents, it

was too easily circumvented. Individuals who wished to avoid a

paper trail for any reason could simply segment large sums of

money into several transactions of less than $10,000. In an

apparent effort to plug this loophole, Congress amended

3Subchapter II has a number of other regulatory provisions,
including reporting requirements for importing and exporting
currency and for foreign currency transactions. See 31 U.S.C.

5313-17. Congress did not require that an individual be guilty
of some related infraction (say, drug trafficking) before he
could run afoul of these currency regulations. Rather, Congress
provided that individuals who violate the currency regulations
while involved in some other criminal activity are eligible for
harsher penalties than those who violate the currency regulations
alone. Compare 31 U.S.C. 5322(a) with 31 U.S.C. 5322(b).

7

Subchapter II in 1986. Pub. L. No. 99-570, 100 Stat. 3207

(1986), codified at 31 U.S.C. 5324. The new antistructuring

provision limited an individual's ability to dodge the CTR

requirement.4 At the time, Congress considered, but decided not

to alter, section 5322's criminal provisions. Thus, section

5322, which criminalizes conduct undertaken by a "person

willfully violating [subchapter II or a regulation promulgated

under Subchapter II]," applies to the antistructuring section as

well as to the balance of Subchapter II. Although appellants

stand convicted of different offenses Donovan was found guilty

4The amendment read in pertinent part:

No person shall for the purpose of evading
the reporting requirements of section 5313(a)
with respect to such transaction --

. . .

(3) structure or assist in
structuring, or attempt to
structure or assist in structuring,
any transaction with one or more
domestic financial institutions.

31 U.S.C. 5324. The regulations implementing the statute
explained that:

a person structures a transaction if that person,
acting alone, or in conjunction with, or on behalf of,
other persons, conducts or attempts to conduct one or
more transactions in currency, in any amount, at one or
more financial institutions, on one or more days, in
any manner, for the purpose of evading the reporting
requirements . . . . "In any manner" includes, but is
not limited to, the breaking down of a single sum of
currency exceeding $10,000 into smaller sums, including
sums at or below $10,000, or the conduct of a
transaction, or series of currency transactions,
including transactions at or below $10,000.

31 C.F.R. 103.11(n) (1989).

8

of violating the CTR provision while the other two appellants

were convicted of structuring infractions they all argue that

section 5322's willfulness requirement means that, to be found

guilty, they must have intentionally traversed a known legal

duty. Consequently, they press a subjective standard of intent

and asseverate that mistake of law necessarily constitutes a

complete defense to the charges laid against them.

The government takes a diametrically opposite view. It

contends that, because Congress made no express provision to the

contrary, ignorance of the law cannot serve as a defense to the

instant charges. See generally United States v. Dotterweich, 320

U.S. 277, 284 (1943) (holding that consciousness of wrongdoing is

not necessary for conviction). The government's position derives

some support from an array of appellate cases which have

disallowed mistake-of-law defenses in the transactional

structuring milieu. See, e.g., United States v. Ratzlaf, 976

F.2d 1280, 1283 (9th Cir. 1992); United States v. Caming, 968

F.2d 232, 238-39 (2d Cir.), cert. denied, 113 S. Ct. 416 (1992);

United States v. Gibbons, 968 F.2d 639, 644 (8th Cir. 1992);

United States v. Rogers, 962 F.2d 342, 344 (4th Cir. 1992);

United States v. Brown, 954 F.2d 1563, 1568 (11th Cir.), cert.

denied, 113 S. Ct. 284 (1992); United States v. Dashney, 937 F.2d

532, 538 (10th Cir.), cert. denied, 112 S. Ct. 402 (1991); United

States v. Scanio, 900 F.2d 485, 490 (2d Cir. 1990). For the

reasons discussed below, we think these cases read section 5322

in an overly malleable manner.

9

B. Mens Rea: CTR Violations.

We start by analyzing the mens rea required with

respect to CTR violations. Under the criminal penalty provision,

31 U.S.C. 5322, violations, to be culpable, must be "willful."

The Court has long recognized that willful "is a word of many

meanings, its construction often being influenced by its

context." Spies v. United States, 317 U.S. 492, 497 (1943). See

generally Note, An Analysis of the Term "Willful" in Federal

Criminal Statutes, 51 Notre Dame L. Rev. 786, 786-87 (1976).

Courts have coalesced around four definitions of

willfulness. The first, which is most closely aligned with the

government's theory here, simply equates "willful" with "knowing"

(i.e., so long as the defendant is aware of his conduct and the

nature of his circumstances, no more is necessary). See, e.g.,

United States v. McCalvin, 608 F.2d 1167, 1171 (8th Cir. 1979);

see also American Law Institute, Model Penal Code 2.02(8)

(1985).5 The second definition of willfulness, which is most

5An exchange between Judge Learned Hand and the reporter for
the Model Penal Code, Professor Herbert Wechsler, indicates that
the Code's principal architects thought that the term "willfully"
added very little to statutory meaning:

Judge Hand: [Willfully is] an awful word!
Judge Hand
It is one of the most troublesome words in a
statute that I know. If I were to have the
index purged, "wilful" would lead all the
rest in spite of its being at the end of the
alphabet.

Professor Wechsler: I agree with you Judge
Professor Wechsler
Hand, and I promise you unequivocally that
the word will never be used in the definition
of any offense in the Code. But because it
is such a dreadful word and so common in the

10

closely aligned with appellants' position, has its roots in tax-

crime cases. This approach equates willfulness with the

violation of a known legal duty. See, e.g., Cheek v. United

States, 111 S. Ct. 604, 610 (1991) (discussed infra Part II(D)).

To our knowledge, no court of appeals has applied either of these

first two definitions across the board in connection with the

entire array of Subchapter II violations.

Several courts, however, have taken a hybrid approach

to the issue of willfulness in the purlieus of Subchapter II.

This approach is marked by its protean quality. Depending on the

language of each particular regulatory provision, the word

"willfully" as used in section 5322 takes on a variety of

meanings, allowing mistake of law as a defense to certain crimes

and not to others. This viewpoint is best typified by Scanio and

its progeny. See Scanio, 900 F.2d at 490 (permitting mistake-of-

law defense as to some currency-related crimes while prohibiting

such a defense vis-a-vis other currency-related crimes); see also

cases collected supra at p. 9.

We think that all three of these definitions create

needless problems. The government's theory undervalues the

statute's language by reading willfulness as if it were simply a

regulatory statutes, it seemed to me useful
to superimpose some norm of meaning on it.

American Law Institute, Model Penal Code 2.20, at 249 n.47

(1985).

11

synonym for general intent.6 In contrast, appellants' theory,

if applied across the board, would allow all mistakes of law, no

matter how unreasonable, to serve as bucklers against

prosecution, and, in the bargain, would vitiate the general

principle that "deliberate ignorance and positive knowledge are

equally culpable." United States v. Jewell, 532 F.2d 697, 700

(9th Cir.), cert. denied, 426 U.S. 951 (1976). Last, while

Scanio and its progeny adopt a flexible definition of

willfulness, they neither speak to the mens rea for CTR

violations nor answer the critical question of how differing

definitions can attach to a single usage of an operative term in

a single statutory section.

For our part, we take yet a fourth tack a tack

adumbrated by the course we set in United States v. Bank of New

England, 821 F.2d 844 (1st Cir.), cert. denied, 484 U.S. 943

(1987). In that case, we plotted the intersection between

section 5322's willfulness criterion and section 5313's CTR

requirements. See id. at 854-59. Bank of New England had failed

to prepare CTRs when a customer repeatedly withdrew cash

aggregating over $10,000 by means of multiple checks, each

written for slightly under $10,000. The bank argued that it had

not engaged in willful misconduct because it had not "violated a

6It is a common rule of statutory interpretation that courts
must give effect to legislative terms wherever possible. See

Gade v. National Solid Wastes Management Ass'n, 112 S. Ct. 2374,

2384 (1992); United States v. Menasche, 348 U.S. 528, 538-39

(1955). We cite this familiar tenet because there would have
been no need for Congress to include the term "willfully" at all
if the government's reading of section 5322 were accurate.

12

known legal duty." Id. at 856. We rejected the bank's plea

because the evidence revealed that the bank's professed

unawareness about whether the reporting requirements applied to

the transactions was a product of the bank's deliberate

blindness. See id. at 856, 857.

Our opinion in Bank of New England is not pathbreaking;

it merely represents a particularized application of the rule

defenestrating mistake-of-law defenses when the mistakes in

question result from intentional or reckless disregard of a legal

duty. See McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133,

135 n.13 (1988) (willfulness may be shown either by actual

knowledge or by "reckless disregard for the matter of whether

[defendant's] conduct was prohibited by the statute"); Trans

World Airlines, Inc. v. Thurston, 469 U.S. 111, 126-28 (1985)

(similar); see also Bank of New England, 821 F.2d at 886 ("the

Supreme Court has endorsed defining willfulness, in both civil

and criminal contexts, as 'a disregard for the governing statute

and an indifference to its requirements'") (quoting Trans World

Airlines, 469 U.S. at 127).

We adhere today to the teachings of Bank of New England

and build upon that foundation. We believe that, in respect to

alleged violations of the BFTRA's CTR provisions, section 5322's

willfulness criterion demands that the government prove either

the violation of a known legal duty or the reckless disregard of

the same. See Bank of New England, 821 F.2d at 866. We move

forward from that point, therefore, to consider a question not

13

present in Bank of New England: the significance of section 5322

in the antistructuring context.

C. Willful Structuring: One Word, One Meaning.

Section 5322 provides criminal sanctions for both CTR

and structuring offenses. As we determine the mens rea

requirement for the latter group of crimes, it is axiomatic that

the plain words and structure of the statute must be paramount.

See, e.g., Pennsylvania Dep't of Pub. Welfare v. Davenport, 495

U.S. 552, 557-58 (1990); Stowell v. Ives, 976 F.2d 65, 69 (1st

Cir. 1992). Ordinarily, "identical terms within an Act bear the

same meaning." Estate of Cowart v. Nicklos Drilling Co., 112 S.

Ct. 2589, 2596 (1992); accord Sullivan v. Stroop, 496 U.S. 478,

484 (1990). In the case at hand, the Cowart presumption is

particularly strong. We explain briefly.

While courts have found on infrequent occasion that

Congress intended a word to have different connotations when used

in different provisions of the same Act, see, e.g., Greenwood

Trust Co. v. Massachusetts, 971 F.2d 818, 830 n.10 (1st Cir.

1992), petition for cert. filed, 61 U.S.L.W. 3382 (U.S. Nov. 4,

1992) (No. 92-794); New Eng. Tel. & Tel. Co. v. Public Utils.

Comm'n, 742 F.2d 1, 8 (1st Cir. 1984), cert. denied, 476 U.S.

1174 (1986), those instances almost always involve, at a bare

minimum, multiple uses of a term or phrase within a panoramic

statutory scheme. Here, however, we are not dealing with

repetitions of a word at diverse points in a statute, but with a

single word in a single statutory section. Ascribing various

14

meanings to a single iteration of a single word reading the

word differently for each code section to which it applies

would open Pandora's jar. If courts can render meaning so

malleable, the usefulness of a single penalty provision for a

group of related code sections will be eviscerated and, by

extension, almost any code section that references a group of

other code sections would become susceptible to individuated

interpretation.

Furthermore, if Congress wanted the purposive mens rea

in the antistructuring statute to stand alone, it had several

simple options. It could, for example, have placed the

antistructuring provision somewhere other than in Subchapter II,

or amended the criminal sanctions provision to except structuring

violations.7 It exercised none of the available options. Thus,

absent powerful evidence to the contrary, we believe courts

should presume that Congress intended the mens rea set by section

5322 to apply in equal measure to both CTR violations and

structuring offenses.

We recognize, of course, that notwithstanding these

problems, several other courts have scuttled the Cowart

presumption and read the word "willfully" in section 5322

differently as it applies to breaches of different currency

regulations. Compare, e.g., Brown, 954 F.2d at 1568 (ruling that

7In fact, Congress chose precisely this course for the
provision requiring reports on foreign currency transactions, 31
U.S.C. 5315, leaving only civil penalties available for
enforcement of that provision. See 31 U.S.C. 5322(a)-(b).

15

knowledge of the antistructuring law was not required to ground a

structuring conviction) and Scanio, 900 F.2d at 490 (same) with,

e.g., United States v. Eisenstein, 731 F.2d 1540, 1543 (11th Cir.

1984) (upholding mistake-of-law defense for currency import and

export violations) and United States v. Dichne, 612 F.2d 632, 636

(2d Cir. 1979) (similar), cert. denied, 445 U.S. 928 (1980). See

also Dashney, 937 F.2d at 539-40 (declaring mistake of law to be

a defense in respect to violations of currency import and export

regulations but not in respect to structuring offenses). To

warrant redefining "willfully" from crime to crime within the

same statute, these courts generally attempt to distinguish

antistructuring regulations from, say, currency importing

regulations, on the basis of the "reasonable probability that

knowledge [of the law] might be obtained" more easily in the

former situation than in the latter. Scanio, 900 F.2d at 490

(citation omitted).

We must respectfully disagree with these courts. The

distinction that they draw simply does not justify the

transmogrification of the word "willfully" into a statutory

chameleon. We are, moreover, particularly chary about adopting

so pleochroic an approach in light of the more consistent, less

complicated alternative offered in Bank of New England, 821 F.2d

at 856. That alternative, which derives great vitality from the

Supreme Court's language, see McLaughlin, 486 U.S. at 133; Trans

World Airlines, 469 U.S. at 126, provides a fair, workable,

mistake-of-law defense to those accused of currency-related

16

crimes and at the same time ensures that defendants who know of

the law's requirements in a general sense, but recklessly or

intentionally fail to investigate the legality of structuring or

other proscribed activity, will be found guilty.

We hold, therefore, that the plain language of section

5322 governs; that the unitary willfulness standard of section

5322 should be given an identical meaning with respect to

structuring and CTR violations;8 and that, therefore, an

8Because this issue is susceptible to resolution in terms of
the plain meaning and structure of the statute, we need not probe
the legislative history. See United States v. Charles George

Trucking Co., 823 F.2d 685, 688 (1st Cir. 1987) (one should

"resort to the legislative history and other aids of statutory
construction only when the literal words of the statute create
ambiguity or lead to an unreasonable interpretation") (citation
and internal quotation marks omitted); accord Barnhill v.

Johnson, 112 S. Ct. 1386, 1391 (1992); Stowell, 976 F.2d at 69.

We note in passing, however, that while the legislative history
with regard to section 5322 and the antistructuring amendments in
no way contradicts our analysis of how the word "willfully"
should be construed, this is yet another case where the
legislative history of a statute "is more conflicting than the
text is ambiguous." Wong Yang Sung v. McGrath, 339 U.S. 33, 49

(1950).

The report issued by the House of Representatives in
conjunction with the bill which included the criminal sanctions
section now codified as 31 U.S.C. 5322 merely recapitulated the
Act's criminal provisions. And, although the House and Senate
issued seventeen reports dealing with a salmagundi of proposed
bills, features of which were amalgamated into the Anti-Drug
Abuse Act of 1986 (the bill which contained the antistructuring
provision now codified as 31 U.S.C. 5324), there was no House
or Senate report accompanying the Act. See 1986 U.S.C.C.A.N.

5393 (noting the absence of a report but listing related
reports). To be sure, the House considered and rejected
several alterations to section 5322 that would have changed the
term "willfully" to "knowingly." See, e.g., H.R.Rep. No. 855,

99th Cong., 2d Sess. 7, 27 (1986). The Senate likewise
considered legislation designed to make section 5322 read
"knowingly" instead of "willfully." See S. 2683, 99th Cong., 2d

Sess. (1986). The purpose of this proposed change was to
eliminate the possibility of antistructuring liability premised

17

unintentional, non-reckless mistake of law is a complete defense

to a structuring charge.

D. Willfulness in the Tax Code.
D. Willfulness in the Tax Code.

In an effort to read the word "willfully" in a more

charitable manner, all three appellants urge that the Court's

recent decision in United States v. Cheek, 111 S. Ct. 604 (1991),

signifies that federal courts should apply a purely subjective

standard to virtually all white-collar crimes that require a mens

rea of willfulness as an element of the offense. Such a standard

differs from the standard we endorse today because it would allow

mistakes born of intentional or reckless ignorance to insulate

defendants from criminal liability. Donovan's case illustrates

the practical effect of this suggestion: had the trial judge

defined willfulness exclusively in terms of a subjective intent

to disobey the law, the jury might have exonerated the defendant

on the basis of a genuine, albeit reckless, misunderstanding

about the law's requirements.

We do not think that Cheek can carry the cargo that

upon "reckless disregard" of the law. See S. Rep. No. 99-433,

99th Cong., 2d Sess. 1, 8 (1986). The amendment failed.

We see no point in reciting additional book and verse.
The most serviceable conclusion that can be woven from the
language in the sundry reports attached to ultimately
unsuccessful legislation is that, during the extended drafting
and redrafting of various bills respecting currency transactions,
Congress, or at least some of its members, reconsidered the mens

rea of section 5322, assessed its relationship with the proposed

antistructuring provision, and elected not to act.

18

appellants load upon it.9 Cheek was a criminal tax case. The

Court noted that the term "willfully," as used in criminal tax

statutes, had long been interpreted "as carving out an exception

to the traditional rule" that ignorance of the law affords no

defense to a criminal prosecution. Id. at 609. Nowhere in

Cheek, or in the Court's earlier opinions involving criminal

prosecutions under the tax laws, see, e.g., United States v.

Pomponio, 429 U.S. 10 (1976) (per curiam); United States v.

Bishop, 412 U.S. 346 (1973); United States v. Murdock, 290 U.S.

389 (1933), is there any indication that courts should use a

purely subjective standard in evaluating state-of-mind defenses

under other federal statutes. Rather, the Cheek Court repeatedly

qualified its discussion of the point by referring to the special

context criminal tax prosecutions from whence the discussion

proceeded. See, e.g., Cheek, 111 S. Ct. at 609, 610. The

Court's earlier opinions stressed the same point. See, e.g.,

Pomponio, 429 U.S. at 12 & n.3; Bishop, 412 U.S. at 360-61. This

repeated qualification makes clear that the Court has crafted a

narrow exception, limited to tax cases, in which subjective

mistake of law can constitute an absolute defense.

Such a conclusion coheres with our long-held

9Our dissenting brother suggests that it is unnecessary for
us to discuss the range of Cheek. See post at 33. We disagree.

If the Cheek rationale extended beyond the boundaries of the tax

code, as appellants claim it does, the result we reach today
would be altered, at least as to appellant Aversa. Moreover, it
is essential to any careful understanding of section 5322's
willfulness standard that we consider, and account for, the
Court's explication of a parallel problem arising under the tax
code.

19

understanding of the tax-crime exception. In United States v.

Aitken, 755 F.2d 188 (1st Cir. 1985), we acknowledged the

uniqueness of the tax statutes' mens rea requirements. See id.

at 193 ("That internal revenue reporting and filing requirements

are an enclave apart is recognized."). We read Cheek as

confirming and fortifying the stance that we took in Aitken.

Moreover, and finally, the rationales supporting a

subjective mistake-of-law defense in tax-crime cases do not apply

to laws and regulations of the kind at issue here. As the Second

Circuit noted, "[o]ne of the most esoteric areas of the law is

that of federal taxation. It is replete with 'full-grown

intricacies,' and it is rare that a 'simple, direct statement of

the law can be made without caveat.'" United States v. Regan,

937 F.2d 823, 827 (citation omitted), modified, 946 F.2d 188 (2d

Cir. 1991), cert. denied, 112 St. Ct. 2273 (1992). The federal

tax code is not only enormous, detailed, and technical, but also

interrelated and highly nuanced. Simply reading the words of the

tax code does not always reveal the line between legal and

illegal conduct. And for over sixty years, the Supreme Court has

held that Congress does not intend to punish those who, in good

faith, stray past that line.

For these reasons, we join the courts of appeals that

have found the Cheek doctrine inapplicable to criminal

prosecutions under the currency reporting laws.10 See, e.g.,

10Attempts to expand Cheek's horizons have been regularly

rejected in most other contexts as well. See, e.g., United

States v. Hollis, 971 F.2d 1441, 1451 (10th Cir. 1992) (rejecting

20

United States v. Beaumont, 972 F.2d 91, 94-95 (5th Cir. 1992);

Brown, 954 F.2d at 1569 n.2; Caming, 968 F.2d at 241; Dashney,

937 F.2d at 539-40. The currency statutes are comparatively few

in number, target a much narrower range of conduct, and under the

current regulations affect a considerably smaller constituency.

The regulatory scheme, overall, is not intricate or even

especially subtle. We think these distinctions are dispositive.

Accordingly, we reaffirm Aitken and continue to hold that the

Cheek exception is restricted to tax crimes. In a prosecution

brought under Subchapter II, as we have explained, the criminal

intent required for conviction is either the violation of a known

legal duty or reckless disregard of the law. Consequently,

appellants' requests for the application of a wholly subjective

standard were properly denied by Judges Loughlin and Devine.

III. APPLYING THE LAW

All that remains is for us to apply the fruits of our

analysis to each appellant's situation.

A. Donovan.

In Donovan's case, the trial judge instructed the jury

that Donovan's actions were willful if he had the "bad purpose to

extension of Cheek to loan fraud context); United States v. Gay,

967 F.2d 322, 327 (9th Cir.) (same; mail fraud case), cert.

denied, 113 S. Ct. 359 (1992); United States v. Chaney, 964 F.2d

437, 446 n.25 (5th Cir. 1992) (same; bank fraud case); United

States v. Dockray, 943 F.2d 152, 156 (1st Cir. 1991) (same; mail

and wire fraud prosecution). A few courts, however, particularly
those faced with cases involving the willful destruction of
government property, have applied a Cheek-like standard. See,

e.g., United States v. Mills, 835 F.2d 1262, 1265 (8th Cir.

1987); United States v. Moylan, 417 F.2d 1002, 1004 (4th Cir.

1969), cert. denied, 397 U.S. 910 (1970).

21

disobey or to disregard the law." While Judge Devine did not

give the exact instruction which Donovan requested, the

instruction he gave was almost identical to the instruction which

we approved for CTR violations in Bank of New England, 821 F.2d

at 855. Moreover, Donovan's requested instruction focused on bad

motive and the Cheek Court made clear that a showing of bad

motive is more restrictive than necessary, even under the tax-

crime standard. See Cheek, 111 S. Ct. at 610; see also Pomponio,

429 U.S. at 13. Finally, the judge allowed the parties to

introduce evidence pertaining to Donovan's state of mind

regarding the law and the facts.

The trial court which, in instructing the jury, had

no obligation to parrot the precise language favored by either

side gave a charge that, viewed in its entirety, adequately

explained the legal issues, including every legitimate theory

upon which Donovan's defense could rest. No more was exigible.

See United States v. McGill, 953 F.2d 10, 13 (1st Cir. 1992);

United States v. Nivica, 887 F.2d 1110, 1124 (1st Cir. 1989),

cert. denied, 494 U.S. 1005 (1990). This is especially true

where, as here, the defendant's subjective mistake-of-law

proposal went well beyond what the law requires in its insistence

upon proof of evil motive. See, e.g., United States v. David,

940 F.2d 722, 738 (1st Cir. 1991) (holding that the district

court may appropriately refuse to give a proposed jury

instruction "which is incorrect, misleading, or incomplete in

some material respect"), cert. denied, 112 S. Ct. 605, 908, 1298,

22

2301 (1992).

B. Aversa and Mento.

We find the remaining appeals to be cut from different

cloth. Because of restrictive rulings made below, neither Aversa

nor Mento ever had a chance to present a mistake-of-law defense.

Both of them were precluded by the government's successful motion

in limine from offering any evidence as to their ignorance of the

antistructuring law. Additionally, in Mento's case the district

judge charged the jury that mistake of law was no defense,

declaring: "It is not necessary that the United States prove

that the defendant knew that the structuring of his currency

transactions was unlawful."

Since neither of these defendants were afforded an

opportunity to develop the record, and since both of them claim

not to have known that what they did was illegal, we cannot say

what a fully amplified record might show regarding Aversa's and

Mento's familiarity with, or actual knowledge of, the

antistructuring law.11 Similarly, we cannot say how the proof

might shape up in respect to reckless disregard or deliberate

blindness. It follows inexorably that, on this scumbled record,

Aversa's and Mento's convictions cannot stand.

IV. CONCLUSION

We need go no further. In the context of the

antistructuring and CTR provisions of Subchapter II, we find that

11We do know, however, that in the plea agreement the
government stipulated that it had no evidence of actual knowledge
on Aversa's part.

23

a willful action is one committed in violation of a known legal

duty or in consequence of a defendant's reckless disregard of

such a duty. In Donovan's case, the introduction of evidence was

not unduly restricted and the district court's charge to the jury

was adequate to comport with the proper standard. Thus, his

appeal fails.12 Because neither Aversa nor Mento had a chance to

present evidence on a mistake-of-law theory, and because the

trial court's jury instruction in Mento's case was harmfully

erroneous, their convictions must be vacated and their cases

remanded for further proceedings. By the terms of Fed. R. Crim.

P. 11(a)(2), Aversa may, if he so elects, withdraw his guilty

plea in the court below. See United States v. Lyons, 898 F.2d

210, 214 n.5 (1st Cir.), cert. denied, 111 S. Ct. 295 (1990).

In Appeal No. 91-1574, the judgment of conviction is

affirmed.

In Appeals Nos. 91-1363 and 91-1364, the judgments of

conviction are vacated and the cases remanded for further

proceedings not inconsistent herewith.

Concurring Opinion follows

Dissent follows Concurring Opinion

12Donovan's remaining ground of appeal was convincingly
dispatched in the prior panel opinion. Hence, we reinstate that
opinion in redacted form, expressly adopting Part IV thereof.

24

BREYER, Chief Judge (concurring). I believe that

criminal prosecutions for "currency law" violations, of the

sort at issue here, very much resemble criminal prosecutions

for tax law violations. Compare 26 U.S.C. 6050I, 7203

with 31 U.S.C. 5322, 5324. Both sets of laws are

technical; and both sets of laws sometimes criminalize

conduct that would not strike an ordinary citizen as immoral

or likely unlawful. Thus, both sets of laws may lead to the

unfair result of criminally prosecuting individuals who

subjectively and honestly believe they have not acted

criminally. United States v. Cheek, 111 S. Ct. 604 (1991),

sets forth a legal standard that, by requiring proof that

the defendant was subjectively aware of the duty at issue,

would avoid such unfair results. Were I writing on a blank

slate, the similarity of the two sets of criminal laws might

well lead me to conclude that the same standards should

apply in both sets of cases. Other circuits, however, have

distinguished "currency reporting" cases from Cheek. See en

banc opinion, supra at p. 20. Moreover, Supreme Court

opinions have strongly suggested that criminal tax cases

constitute a separate enclave in the law. See en banc

opinion, supra at pp. 18-19.

25

In addition, the court today announces a standard

that does not threaten to allow conviction of a defendant

with an innocent state of mind. Under the court's standard,

the government must prove that the defendant either

subjectively knew of his legal duty, or that he was

"reckless" in respect to the existence of that duty. Cf.

McLaughlin v. Richland Shoe Co., 486 U.S. at 135 n.13 (even

objectively unreasonable failure to determine correct legal

obligation is not "willful," as long as such failure falls

short of recklessness). One can imagine how a person

frequently in contact with these laws, such as a financial

officer or drug-fund courier, could be found to have been

"reckless" in failing to learn relevant legal data.

However, it is difficult to see how one could convict an

ordinary citizen on this basis, i.e., in the absence of

actual, subjective knowledge of the legal duty, for

"recklessness" involves the conscious disregard of a

substantial risk. See Model Penal Code 2.02(2)(c)(1985);

cf. United States v. Murdock, 290 U.S. 389, 395 (1933)

(conduct is "willful" in the context of a criminal statute

if it is "marked by careless disregard [for] whether or not

one has the right to act").

26

I therefore conclude that the court's announced

standard is sufficiently close to the purely subjective

standard set forth in Cheek that it will avoid using the

criminal law, in this technical area, to punish those with

an innocent state of mind, those who did not know they were

violating the law and who reasonably failed to investigate

the issue. I therefore join the court's opinion.

Dissent follows

27

TORRUELLA, Circuit Judge (Dissenting). Although I

agree with much of what is stated by the majority, and even more

with Chief Judge Breyer's concurrence, I write separately because

I believe neither opinion goes far enough. In my view the

prosecution of these cases is defective on two grounds: (1) As

clearly reflected in the legislative history of these statutes,

appellants are improper targets of money laundering accusations,

and (2) even if the charges are within statutory scope, the

standard of scienter in Cheek v. United States, 498 U.S. 192

(1991), is applicable to them.

I. ACTIVITY TARGETED BY THE BANK

SECRECY ACT, AS AMENDED BY THE

MONEY LAUNDERING CONTROL ACT

I need not repeat the facts as stated by the majority.

I will only emphasize that appellants are neither the recipients

of illegal drug funds or engaged in laundering money proceeds

from criminal ventures, nor are they income tax evaders. In

fact, particularly in the case of appellants Aversa and Mento,

they did nothing prior to the alleged "structuring" actions that

even approximates the commission of a criminal offense. I focus

on the Bank Secrecy Act and its more recent amendment, the Money

Laundering Control Act, to determine whether appellants' actions

are within the purview of the conduct that Congress intended to

criminalize by this legislation.

-28-
28

The Bank Secrecy Act, enacted in 1970, was part of the

Bank Records and Foreign Transaction Act.13 The unequivocal

concern of this complex legislation was to prohibit the use of

foreign banks to "launder" the proceeds of illegal activity or

evade federal income taxes.14 It became apparent, however,

that these enactments had little impact on large-scale money

laundering related to illegal drug transactions, and that illicit

funds were flowing in ever-increasing amounts into financial

institutions in the United States.15 As a result, Congress

enacted the Anti-Drug Abuse Act of 1986,16 Title I, subtitle H

of which was the Money Laundering Control Act of 1986. This

subtitle included an anti-structuring provision.17

One thing clearly emerges from the legislative history

of this statute: Congress wished to attack money laundering

associated with organized crime or related criminal activity,

particularly the illicit drug trade. See S. Rep. No. 433, 99th

Cong., 2d Sess. (1986) (accompanying S. 2683). A casual review

of the Senate Report accompanying this Act reveals that the term

"money laundering," or its equivalent, is used more than 100

13 Pub. L. No. 91-508, 84 Stat. 1114 (1970) (codified as amended
in scattered sections of 12 U.S.C., 15 U.S.C. and 31 U.S.C.).

14 S. Rep. No. 433, 99th Cong., 2d Sess. 2-3 (1986).

15 See The President's Commission on Organized Crime, Interim

Report to the President and the Attorney General, The Cash

Connection: Organized Crime, Financial Institutions, and Money

Laundering (1984); S. Rep. No. 433 (1986).

16 Pub. L. No. 99-570, 100 Stat. 3207.

17 31 U.S.C.A. 5324 (West Supp. 1992).

-29-
29

times, and that it refers to organized crime and criminal

activity on no less than 53 occasions. Id. The House Report

displays a similar preoccupation. See H.R. Rep. No. 746, 99th

Cong., 2d Sess. (1986) (accompanying H.R. 5176). The first major

heading of this report is "Drug Trafficking and Money

Laundering." Id. at p. 16. The report refers to "money

laundering" approximately 73 times, and to organized crime and

illegal drug trafficking 53 times.

Given the congressional preoccupation with money

laundering it is surprising that neither the term "money

laundering," nor the new crime created by the Money Laundering

Control Act, "structuring," are defined by the statute.

Nevertheless, the House Report states the following:

Money Laundering Defined. - The

President's Commission on Organized Crime
has defined money laundering as the
"process by which one conceals the
existence, illegal source, or illegal
application of income, and then disguises
that income to make it appear
legitimate." In other words, laundering
involves the hiding of the paper trail
that connects income or money with a
person in order for such person to evade

the payment of taxes, avoid prosecution,

or obviate any forfeiture of his illegal

drug income or assets. . . .

Id. at 16 (emphasis supplied).

I derive additional guidance from the Senate Report

that discusses what later became 18 U.S.C. 1956(a)(1), which is

entitled Laundering of Monetary Instruments. See S. Rep. No. 433

at 9. The report calls section 1956 "the basic money laundering

-30-
30

offense." Id. That section, which in effect defines

"laundering," provides:

-31-
31

Whoever knowing that the property

involved in a financial transaction

represents the proceeds of some form of

unlawful activity, conducts or attempts

to conduct such a financial transaction
which in fact involves the proceeds of
specified unlawful activity--(B) knowing
that the transaction is designed in whole
or in part -- (i) to conceal or disguise
the nature, the location, the source, the
ownership, or the control of the proceeds
of specified unlawful activity; or (ii)
to avoid a transaction reporting
requirement under State or Federal law .
. . . [will be liable for conviction
under this section].

18 U.S.C. 1956(a)(1) (emphasis supplied).

On the other hand, "structuring" is only defined by

regulation. 31 C.F.R. 103.53, entitled "Structured

Transactions," provides that:

No person shall for the purpose of
evading the reporting requirement of
103.22 with respect to such transaction:

. . .

(c) Structure (as that term is defined
in 103.11(n) of this part) or assist in
structuring, or attempt to structure or
assist in structuring, any transaction
with one or more domestic financial
institutions.

31 C.F.R. 103.53.

Regulation 31 C.F.R. 103.11(n) (1989) defines

"structure" or "structuring" as:

(n) Structure (structuring). For

purposes of section 103.53, a person
structures a transaction if that person,
acting alone, or in conjunction with, or
on behalf of, other persons, conducts or
attempts to conduct one or more
transactions in currency, in any amount,
at one or more financial institutions, on

-32-
32

one or more days, in any manner, for the
purpose of evading the reporting
requirements under section 103.22 of this
Part. "In any manner" includes, but is
not limited to, the breaking down of a
single sum of currency exceeding $10,000
into smaller sums, including sums at or
below $10,000, or the conduct of a
transaction, or series of currency
transactions, including transactions at
or below $10,000. The transaction or
transactions need not exceed the $10,000
reporting threshold at any single
financial institution on any single day
in order to constitute structuring within
the meaning of this definition.

31 C.F.R. 103.11(n) (1989); see also S. Rep. No. 433 at 22, 25

("structuring" is "breaking up of what is really one financial

transaction into several smaller ones to evade reporting

requirements").

During the hearings preceding enactment of this

legislation concern was expressed that this maze of interwoven

regulations and statutes, although aimed at crippling organized

crime, "could lead to prosecution of people who were not in any

way involved in money laundering." See S. Rep. No. 433 at 12;

see also John K. Villa, A Critical View of Bank Secrecy Act

Enforcement and the Money Laundering Statute, 37 Cath. U.L. Rev.

489 (1988). The present appeals are living proof of that

prophecy. Appellants are being prosecuted for violation of the

money laundering statutes notwithstanding that they are not in

any way involved in such activities.

The situation presented by these charges is not unlike

that in McNally v. United States, 483 U.S. 350 (1987), in which

the Supreme Court reversed a unanimous litany of circuit court

-33-
33

decisions18 condoning the extension of the federal mail fraud

statute19 beyond the scope of Congress' intended coverage. In

charging appellants under the money laundering statutes the

government similarly overlooked that "[i]n considering the scope

of [a] statute it is essential to remember Congress' purpose in

enacting it." Id. at 365 (Stevens, J., dissenting).

In prosecuting appellants under the Bank Secrecy Act as

amended by the Money Laundering Control Act, the government has

transgressed Congress' purpose in the enactment of these

statutes, which was to detect and punish "financial

transaction[s] represent[ing] the proceeds of some form of

unlawful activity," 18 U.S.C. 1956(a)(1). We should not stand

idly while this overreaching transforms common citizens into

criminals.

II. THE CHEEK STANDARD

While it could have been possible to leave Cheek v.

United States, 498 U.S. 192, 111 S. Ct. 604 (1991), out of this

appeal altogether, the majority opinion seeks to restrict its

present and future use by preemptive action. I believe it would

be more appropriate to consider one case at a time. Furthermore,

lest there be any doubt, I certainly am not of the view that the

Cheek standard should apply in blanket fashion "to virtually all

white collar crimes that require a mens rea of willfulness as an

18 Including some from this circuit. See, e.g., United States

v. Silvano, 812 F.2d 754 (1st Cir. 1987).

19 18 U.S.C. 1341.

-34-
34

element of the offense." Ante at 18. In my view each

legislative scheme must be separately pondered to determine

whether Cheek applies. But I cannot agree that because Cheek was

an income tax case that the principle espoused therein regarding

mens rea is necessarily limited to such tax cases. I can find

nothing in Cheek to justify such a conclusion or limitation.

Logic and fundamental fairness dictate that some traditional

legal maxims, up to now blindly accepted, make little sense in

the context of some of today's complex regulatory environments.

Ultimately Cheek stands for the proposition that at some point a

legal fiction may so depart from reality as to be untenable as a

basis for criminal responsibility.

In Cheek, the Supreme Court examined the meaning of

"willfully" as used in the income tax statutes. Defendant Cheek,

a commercial airline pilot, refused to file income tax returns

after 1979. As a result, Cheek was indicted and charged with

willfully violating 26 U.S.C. 7203 & 7201.20

At trial, Cheek presented as his defense that "he

sincerely believed that the tax laws were being

unconstitutionally enforced and that his actions during 1980-1986

period were lawful." Cheek, 498 U.S. at , 111 S. Ct. at 607.

During deliberations, the jury was divided on whether Cheek

honestly and reasonably believed that he was not required to pay

20 Section 7201 criminalizes the "willful[] attempt[] in any
manner to evade or defeat any tax imposed by this title or the
payment thereof." 26 U.S.C. 7201. Section 7203 criminalizes
the willful failure to file a return as required under Title 26.

-35-
35

income taxes. However, the district court instructed the jury

"that a good-faith misunderstanding of the law or a good faith

belief that one is not violating the law, if it is to negate

willfulness, must be objectively reasonable." 498 U.S. at ,

111 S. Ct. at 608. With this instruction in hand, the jury found

Cheek guilty on all counts. Cheek appealed on the ground that

this instruction was erroneous. The Seventh Circuit affirmed.

The Supreme Court, relying on its prior criminal tax

precedents interpreting the word "willfully," reversed Cheek's

conviction. It held that no matter how unreasonable a judge

might deem Cheek's beliefs, the jury must have the opportunity to

hear them and make the final determination as to whether he had a

good faith misunderstanding of the law or a good faith belief

that he was not violating the law, thus negating the element of

willfulness. 498 U.S. at , 111 S. Ct. at 610.21

Cheek establishes that the government must prove in a

criminal tax case a "willful" violation, which requires proof

that a defendant voluntarily and intentionally violated a known

legal duty. 498 U.S. at , 111 S. Ct. at 611. More in point

with the present appeals, however, the Court stressed that

[t]he proliferation of statutes and
regulations has sometimes made it
difficult for the average citizen to know
and comprehend the extent of the duties

21 The Court therefore held that the district court erred when
it instructed the jury that Cheek's "asserted beliefs that wages
are not income and that he was not a taxpayer within the meaning
of the Internal Revenue Code should not be considered by the jury
in determining whether Cheek has acted willfully." 498 U.S. at
, 111 S. Ct. at 613.

-36-
36

and obligations imposed by the tax laws.
Congress has accordingly softened the
impact of the common-law presumption by
making specific intent to violate the law
an element of certain federal criminal
tax offenses.

498 U.S. at , 111 S. Ct. at 609. The Court could well have

been talking about the arcane money laundering regulatory scheme

presented by these appeals.

It is pointed out that the application of Cheek to the

anti-structuring statute was rejected by the Tenth Circuit in

United States v. Dashney, 937 F.2d 532 (10th Cir.), cert. denied,

60 U.S.L.W. 3343 (1991), and that other courts have followed

Dashney's analysis. See United States v. Brown, 954 F.2d 1563

(11th Cir. 1992); United States v. Rogers, No. 91-5106, slip op.

(4th Cir. Apr. 24, 1992).

In Dashney, the court concluded that the anti-

structuring act did not require, as an element of the offense,

proof of a specific intent to violate the act because, the

provisions of the anti-structuring act are "straightforward" when

compared to the criminal tax statutes at issue in Cheek.

Dashney, 937 F.2d at 540. After spending a considerable amount

of time studying these statutes and regulations, as well as their

legislative history, I must confess to a different view.

The conclusion that engaging in a currency transaction

is more "straightforward" than filing an income tax return is at

best, unconvincing. The legal duty at issue here -- the

illegality of structuring a transaction in order to prevent a

bank from filing a currency transaction report -- does not even

-37-
37

approximate the general knowledge of the duty of taxpayers to

file an income tax return.22 The statutes criminalizing the

conduct of failing to file an income tax return have been around

for more than 70 years whereas the anti-structuring act did not

clearly criminalize the conduct of structuring transactions until

1986, when Congress enacted 31 U.S.C. 5324 and 5522.23 If

nothing else emerges from a study of this byzantine labyrinth of

legislation and regulation, it is that an unsuspecting common

citizen can easily fall prey to this uncommon area of the law.

Apparently, with this in mind the Treasury Department proposed,

but failed to adopt, regulations aimed at publicizing the

criminal offense underlying 5324. See 54 Fed. Reg. 20,398

22 In Cheek, Justice Blackmun, with whom Justice Marshall joined

in dissent, stated that:

[I]t is incomprehensible to me how, in
this day, more than 70 years after the
institution of our present federal income
tax system . . . any taxpayer of
competent mentality can assert as his
defense to charges of statutory
willfulness the proposition that the wage
he receives for his labor is not income
. . . .

498 U.S. at , 111 S. Ct. at 615.

23 In fact, until the enactment of the Money Laundering Act, a
conflict among the circuits existed as to whether it was a crime
to structure deposits for the purpose of preventing the bank from
reporting. Compare United States v. Larson, 796 F.2d 244, 246-47

(8th Cir. 1986); United States v. Varbel, 780 F.2d 758, 760-63

(9th Cir. 1986); United States v. Denemark, 779 F.2d 1559, 1561-

64 (11th Cir. 1986); United States v. Anzalone, 766 F.2d 676,

679-83 (1st Cir. 1985) with United States v. Heyman, 794 F.2d

788, 790-93 (2d Cir.), cert. denied, 479 U.S. 989 (1986); United

States v. Cook, 745 F.2d 1311, 1314-16 (10th Cir. 1984), cert.

denied, 469 U.S. 1220 (1985); United States v. Tobon-Builes, 706

F.2d 1092, 1096-1101 (11th Cir. 1983).

-38-
38

(1989). It is obvious that our Anzalone opinion had little

effect on bureaucratic thinking. See Anzalone, 766 F.2d at 681-

82.

I recognize, as has the majority, that not all

appellants are in the same legal position on this last issue. In

my opinion, in case No. 91-1574, appellant Donovan received

substantially the jury charge that he was entitled to under

Cheek. Appellants Aversa and Mento in cases Nos. 91-1363 and 91-

1364 did not. The problem is, nevertheless, that in my view none

of the appellants should have been charged because, as previously

explained, the government overstretched its anti-moneylaundering

net. Consequently, I must dissent.

-39-
39